IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 14-cv-02258-REB-KMT

SHANE JOHNSON,

    Plaintiff,

v.

CARIE SWIBAS, *et al.*,

    Defendants.

## AFFIDAVIT OF DR. SUSAN TIONA

I, Susan Tiona, being first duly sworn upon oath, depose and state as follows:

    1.    My name is Susan Tiona, and I am a physician and I am currently the Chief Medical Officer for the Colorado Department of Corrections.

    2.    I began my work in this position in May of 2015.

    3.    I have not been hired or specially employed to provide testimony in this case.

    4.    My education and experience are reflected in my *curriculum vitae*, which is attached hereto.

    5.    I have reviewed the medical records for an offender named Shane Johnson, DOC # 99744, and based upon my education, experience, and review of these records, I have the following opinions:

    6.    It is my understanding that Plaintiff claims that he was deprived of medical care for a serious medical need because a medical care provider allegedly

**EXHIBIT A-10**

discontinued/did not order medical snacks for Plaintiff – medical snacks being additional food provided to an offender in addition to the standard diet(s) provided to offenders through offender food service due to a medical need for the same.

7. A person's body mass index (BMI) is a recognized by the National Health Institute and numerous authoritative entities as being a valid indicator of a person's health status as evidenced by being underweight, normal weight, overweight, and obese. Underweight is defined as a BMI of less than 18.5; normal weight is a BMI of 18.5 to 24.9; overweight is a BMI of 25.0 to 29.9; and obese is a BMI of 30.0 or greater.

8. Persons who are in the normal weight category have the best chance of avoiding adverse health outcomes. Persons in the underweight category have a risk of certain adverse health outcomes related to under nutrition. Persons in the overweight and obese categories have an increasingly higher risk of adverse health outcomes related to caloric excess.

9. From October 2010 to February 2016, Plaintiff's weight was checked no fewer than nine times. His weight in pounds was documented as 200 (10/22/10), 199 (1/13/11), 247 (12/21/12), 231 (5/7/13), 230 (6/12/13), 219 (7/17/13), 214 (8/16/13), 206 (9/18/13) and 233 (2/9/16).

10. Plaintiff is 6 feet 3 inches tall. Based on his weights and the formula for calculating the body mass index, Plaintiff's lowest BMI was 24.9 on 1/13/2011 and his highest BMI was 30.9 on 12/21/2012. His current BMI is 29.1.

11. At no time has Plaintiff had a BMI even approaching that of an underweight person. In fact, Plaintiff has always been on the high end of normal weight, or has been frankly overweight.

12. On May 28, 2014, Plaintiff's routine blood work showed a normal serum protein level, normal cholesterol profile, and normal liver function. All of these indices support the fact that Plaintiff has an adequate nutritional status. In addition, caloric or nutritional supplementation has not been medically indicated for Plaintiff at any time during this incarceration.

13. Thus, as a result of my review of his medical records, and my medical knowledge, education, and experience, Plaintiff has not suffered any adverse health outcomes as a result of having his snacks discontinued, and he had no medical need for the same.

14. I am also aware that Plaintiff has reported that he believes he has an allergy to some kind of food contained in his religious diet.

15. Plaintiff's medical records reflect that in October of 2013, he saw medical care providers regarding a rash and his belief that he had some type of food allergy to an item in the kosher diet.

16. The rash that Plaintiff reported was only on his arms (in fact, only documented to be on his left arm) which is not consistent with a food allergy rash, as a food allergy rash would typically involve the entire integumentary system, and not just the arms. A rash involving an isolated body area is more likely to be a contact dermatitis, a skin condition not caused by a food allergy.

17. Plaintiff was referred to a dietician by medical care providers after reporting these symptoms, but Plaintiff was referred to the dietician only for further *consideration* of a *possible* food allergy, to include testing for the same. The providers did not diagnose Plaintiff with a food allergy at that time.

18. In November 2013, Plaintiff underwent a specialized blood test to test for allergies to multiple food substances, and he tested negative for allergies to wheat, rye, barley, oat, corn, rice, peanut, soybean, lentil, and egg.

19. In light of his test results, and in light of the fact that Plaintiff did not present clinically as having a dietary allergy, a food-avoidance diet or alternative kosher diet was not medically indicated.

20. Therefore, as a result of my review of his medical records, and my medical knowledge, education, and experience, Plaintiff did not suffer any adverse health outcomes as a result of not being prescribed a food-avoidance diet.

21. The dieticians to whom Plaintiff was referred did not deprive Plaintiff of treatment for a serious medical need by declining to provide him with an alternative kosher diet, as there was no medical indication for such a diet, given Plaintiff's clinical presentation and the results of the food allergy test.

22. Other than religious diets that are provided for religious accommodations, the CDOC does not provide alternative or substitute meals to inmates in the absence of a medical need, because this would permit inmates to demand meals based upon their personal food preferences.

23. Allowing offenders to make requests for personalized meals in the absence of a medical need would create a potentially substantial administrative burden on CDOC staff and inmate workers responsible for procuring food and preparing meals, and would significantly complicate and increase the labor involved in providing meal service to offenders, as well as the costs of procuring and preparing food for personalized meal preferences.

Further, affiant sayeth naught

_Susan M. Tiona, MD_
Dr. Susan Tiona

Subscribed and sworn to before me in the County of El Paso, State of Colorado, this 9th day of September, 2016.

HOLLY D. WINTERS
Notary Public
State of Colorado
Notary ID # 20124006721
My Commission Expires 02-08-2020

_____
Notary Public

My commission expires:
2/8/2020

6